UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____
                                       )
SECURITIES AND EXCHANGE                )
COMMISSION,                            )
                                       )
                    Plaintiff,         )          Civil Action No.
                                       )
         v.                            )
                                       )
JESSE C. LITVAK,                       )          JURY TRIAL DEMANDED
                                       )
                    Defendant          )
_____)

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges the following against defendant Jesse C. Litvak ("Litvak"):

## SUMMARY

1.      This case involves misrepresentations and misleading conduct by Litvak while he bought and sold mortgage-backed securities ("MBS") as a senior trader at Jefferies & Company, Inc. ("Jefferies"), a broker-dealer.  Part of Litvak's job involved arranging trades between his customers, meaning that he would buy a MBS from one customer and then sell it to another customer.  On numerous occasions from 2009 to 2011, Litvak lied to, or otherwise misled, customers about the price at which his firm had bought the MBS and the amount of his firm's compensation for arranging the trades.  On some occasions, Litvak also misled the customer into believing that he was arranging a MBS trade between customers, when Litvak really was selling the MBS out of Jefferies' inventory.  Litvak's misconduct misled customers about the market price for the MBS, and, thus, about the transaction they were agreeing to.  Litvak also misled customers about whether they were getting the best price for their MBS trades and how much

money they were paying in compensation.  MBS are generally illiquid and discovering a market price for them is difficult.  Participants trading in the MBS market must rely on informal sources, including their broker, for this information.

2.     Jefferies' customers owed fiduciary duties to their clients.  Jefferies' customers included funds which were established by the United States government under a program designed to help strengthen the markets for MBS during the financial crisis.  Had Jefferies' customers been aware that they could have paid less for the MBS they purchased, they would have made an effort to do so.

3.     Litvak engaged in the misconduct to facilitate the purchase and sale of MBS and earn more revenue for Jefferies.  By engaging in the misconduct, Litvak generated over $2.7 million in additional revenue for his firm.  Litvak also sought to improve his own standing at Jefferies.  Litvak's bonus was determined in part by the amount of revenue he generated for the firm.

4.     By engaging in the conduct alleged herein, Litvak violated Section 17(a) of the Securities Act of 1933 ("Securities Act") and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder.  Based on these violations, the Commission seeks:  (1) entry of a permanent injunction prohibiting Litvak from further violations of the relevant provisions of the federal securities laws; (2) disgorgement of Litvak's ill-gotten gains, plus pre-judgment interest; (3) the imposition of a civil monetary penalty due to the egregious nature of Litvak's violations; and (4) such other and further relief as the Court deems just and proper.

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to the enforcement authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d) of the Exchange Act [15 U.S.C. §§78u(d)].

6.      This Court has jurisdiction over this action pursuant to Sections 20(b) and (d) and 22(a) and (c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a),77v(c)]  and Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§78u(d), 78u(e), and 78aa].

7.      Venue is proper in this district pursuant to Section 22(a) of the Securities Act [15 U.S.C. §77v(a)] and Section 27 of the Exchange Act [15 U.S.C. §78aa], because certain of the transactions, acts, practices, and courses of business constituting the violations alleged herein occurred within the District of Connecticut.

8.      In connection with the conduct alleged in this Complaint, Litvak directly or indirectly made use of the means or instruments of transportation or communication in interstate commerce, the facilities of a national securities exchange, or the mails.

9.      Litvak's conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

10.      Unless enjoined, Litvak will continue to engage in the securities law violations alleged herein, or in similar conduct that would violate the federal securities laws.

**DEFENDANT**

11.      Jesse C. Litvak, age 38, is a resident of New York, New York.

12.      Litvak was associated with Jefferies, a broker-dealer, from approximately April 2008 to December 2011.  He served as a managing director and was a trader in Jefferies' MBS group.  He worked at Jefferies' offices in Stamford, Connecticut.

13.      Jefferies, a Delaware corporation, has been registered as a broker-dealer with the Commission since September 17, 1969.  Jefferies is a member of the Financial Industry Regulatory Authority ("FINRA").  Its primary office is in New York, New York.

**FACTUAL ALLEGATIONS**

**A.      Background**

14.      Litvak was an experienced MBS trader who joined Jefferies in 2008.  A MBS is a type of security whose underlying assets are commercial or residential loans.  (MBS, which are debt instruments, are sometimes referred to as "bonds.")   As a senior MBS trader at Jefferies, Litvak arranged trades between buyers and sellers of MBS and purchased and sold securities for and out of Jefferies' inventory.  The MBS consisted of both non-agency residential mortgage-backed securities ("RMBS") (those issued by non-government institutions) and commercial mortgage-backed securities ("CMBS").  Investors in these securities receive payments from the interest and principal payments on the underlying mortgages.

15.      These were illiquid securities, and many of the MBS that Litvak traded had been discounted significantly since the 2007-2008 financial crisis.  The market for MBS is opaque: there is no exchange that shows the buy and sell price for each trade.  Therefore, the buyer of the MBS has no way to learn the price paid by the broker, unless the broker chooses to tell its customer.

4

16.     The price of the MBS is expressed as a percentage of its par value.  A price or level of "100" means that the MBS is trading at 100 percent of its par value.  Similarly, a price or level of "90" means that the MBS is trading at 90 percent of its par value.

17.     As an intermediary, Litvak generally purchased MBS from one customer and then sold the same security to another customer.  In those circumstances, Jefferies and Litvak typically re-sold the MBS on a riskless, principal basis; this meant that, while Jefferies would momentarily own the MBS in a principal account, it had minimal or no risk because it knew that it could re-sell the MBS to another customer.  Litvak earned compensation for Jefferies by re-selling the MBS at a higher price and collecting the spread (or difference) between the purchase price and the sale price.  The customers were aware that Jefferies was compensated in this way, and the amount and source of the compensation were part of the negotiations around purchase and sale of the MBS.

18.     Litvak sometimes offered the customers an "all-in" price for a MBS that incorporated both the purchase price for the security and Jefferies' compensation; on other occasions, Litvak and the customers agreed that Jefferies' compensation would be in addition to, or "on top of," the acquisition price for the MBS.

19.     Jefferies' traders and their customers often discussed the amount of Jefferies' compensation in terms of the number of "ticks" that Jefferies would receive on a trade.  One "tick" equals 1/32 of a point.  For example, a price of 65-16 refers to 65 and 16 ticks or $65^{16/32}$ (or 65.5).

20.     Jefferies' customers were funds that invested in MBS.  Some of them were Legacy Securities Public-Private Investment Program ("PPIP") funds established by the United States government.  Under PPIP, the U.S. Department of Treasury ("U.S. Treasury") invested in

funds advised by private sector fund managers for the purpose of purchasing "eligible assets," typically debt securities that had been issued prior to 2009 and that had originally been given the highest ratings (such as AAA) by a nationally recognized statistical rating organization.  PPIP was designed to help support the market for MBS in the wake of the financial crisis.  Initially, the U.S. Treasury selected nine investment advisers to serve as PPIP managers, including several that became customers of Jefferies' (AllianceBernstein, LP ("AllianceBernstein"); Angelo, Gordon & Co., LP ("Angelo Gordon"); Blackrock, Inc. ("Blackrock"); Invesco, Ltd. ("Invesco"); and Wellington Management, LLP ("Wellington")).  Other customers were hedge funds or non-PPIP funds.

21.     The MBS market operates through relationships between customers, who buy and sell the bonds, and broker-dealers, like Jefferies, that arrange the trades.  Customers seek to pay the lowest price for purchases and get the highest price on sales.  It is not unusual for a customer's view of the current market price for a security to come from the broker-dealer that is selling the security.  Because of this, there is an emphasis on establishing relationships, building trust, and having a good reputation within the industry.  In part because of the opacity of the market, and in part because the market relies on repeat transactions between the same parties, customers seek to avoid broker-dealers who are not honest with them.  Upon learning that Litvak had lied to them about the price he paid for MBS, some customers indicated that their firms would have temporarily stopped doing business with Jefferies had they known the truth. At least one customer, upon learning that Litvak had lied, temporarily stopped doing business with Jefferies.  Some customers indicated they would have sought lower prices on trades, or even tried to re-negotiate trades, had they known the truth.

**B.    Litvak's Misconduct**

22.    From 2009 to 2011, Litvak engaged in misconduct on over 25 trades.  In each instance, Litvak made misrepresentations to, or otherwise misled, customers about the price at which Jefferies had purchased the MBS before re-selling it to the customer and Jefferies' compensation for arranging the trade.  In some cases, Litvak also pretended to be arranging the trade between customers when Jefferies was actually selling MBS out of its own inventory.

23.    When Litvak offered customers MBS, he lied to them about how much Jefferies had paid (or was paying) for the securities.  In order to negotiate a higher sale price to the customers, Litvak misled them into believing that Jefferies had paid a higher price for the MBS than it actually had.

24.    By misrepresenting Jefferies' purchase price, Litvak misled customers about the amount of compensation Jefferies would receive on the transaction.  For example, if Litvak told the customer that Jefferies' purchase price was 80 and the sale price was 80 and 4 ticks, the customer understood that Jefferies received 4 ticks in compensation.  However, if Jefferies' purchase price was actually 79 and the sale price was 80 and 4 ticks, then Jefferies received an extra point in compensation as a result of Litvak's misrepresentation.  On some occasions, Litvak and the customer explicitly agreed on the amount of Jefferies' compensation based on the purchase price as represented by Litvak.

25.    Sometimes, in addition to misrepresenting the price and Jefferies' compensation, Litvak also misled his customers into believing that Jefferies was arranging a trade between two customers, when Jefferies actually was selling a MBS out of its own inventory.  In these instances, Litvak pretended to be actively negotiating with an outside party to buy a MBS that he would then re-sell to his customer.  Litvak communicated precise details to customers about

7

the state of negotiations with the imaginary seller.  But none of these negotiations were taking

place; instead, Litvak fabricated the existence of the seller and every detail about active

negotiations with it.  In fact, as Litvak knew, Jefferies had purchased these MBS days (and even

months) before and already held them in its inventory.

26.      In many cases, Litvak's misrepresentations were made in electronic

communications such as instant messages, emails, and online chats.

### May 28, 2009 Trade with MFA

27.      While arranging a trade on May 28, 2009, Litvak lied to both the seller and buyer

of $25 million of a MBS called IndyMac INDX Mortgage Loan Trust ("INDX") 2007-AR7 2A1

(INDX 2007-AR7 2A1).

28.      A  representative of MFA Mortgage Investments, Inc. ("MFA") told Litvak he

was interested in bidding 42-00 for $25 million in the INDX MBS.  After negotiating with the

seller, Litvak told the MFA representative in an instant message, "I can sell to you at 42-8 . . . I

Bot EM AT at 42-4."  MFA agreed to buy the MBS at 42-8.

29.      Litvak lied to MFA about the acquisition price.  He had bought the security at 41-

4, not "42-4" as he had reported.  The next day, Litvak admitted to a Jefferies colleague that he

had lied to MFA, while also misrepresenting the purchase price to his colleague.  Litvak wrote,

"we bot at 41-12.  Sold to him a[t] 42-8.  He thinks we bot em @42-4 fyi."  Thus, he

misrepresented the purchase price (41-4) both to MFA and to his own colleague.

30.      While he was lying to the buyer, Litvak was also lying to the seller of the MBS,

Third Point LLC ("Third Point").  Although he knew MFA was willing to pay 42-00 for the

MBS, Litvak told a Third Point representative that the MFA representative—whom Litvak

referred to as "one of my circle of trust guys"—had bid only 41-00.  Litvak then reported that he had convinced MFA to raise its bid to 41-16.

31.     Litvak acknowledged to a Jefferies colleague that he misled Third Point, writing, "So we bot [INDX] bonds from [the Third Point representative] at 41-4. . . . she thinks we sold at 41-16 . . . we really sold em at 42-8."

32.     Through his misconduct, Litvak generated more than $200,000 in extra profit for Jefferies on this trade.

### December 9, 2009 Trade with Redtop

33.     On December 8, 2009, Litvak sent an instant message to a representative at Redtop Investors LLC ("Redtop") inquiring about a MBS called New York Mortgage Trust 2005-2 A (NYMT 2005-2-A).  Litvak asked, "what u think of this nymt trade[?]"

34.     The next day, December 9th, Litvak reported back to both the first and a second Redtop representative that he had purchased the MBS, providing precise details of a negotiation with the seller:

> we are good bro…he is selling to me at 79-24…i convinced him that is a rounding error from 80 and he laughed and agreed…13.3 mm orig of nymt 05-2a can be yours for the price of 80…

35.     After receiving this information,  Redtop agreed to purchase the MBS at 80.

36.     Litvak misled Redtop into believing that Litvak was conducting active negotiations on Redtop's behalf.  In reality, Jefferies had purchased the MBS on December 3 (six days earlier) and owned the MBS in its inventory.  Litvak made up the supposed seller and fabricated the details of the negotiation.

37.     Litvak also lied to Redtop about the purchase price and, thus, Jefferies' compensation on the trade.  Litvak did not purchase the MBS at "79-24" as represented to Redtop, but at 72-8.

38.     Through his misconduct, Litvak made over $410,000 more for Jefferies on this trade.

### *December 23, 2009 Trade with Wellington*

39.     On December 23, 2009, Litvak approached a representative at Wellington Management LLP ("Wellington") about purchasing a MBS called Wells Fargo Mortgage Backed Securities 2006-AR12 1a1 (WFMB 06-AR12 1a1).  Litvak suggested to the representative that he was arranging a trade with an active outside party:

> yo yo yo....if there is any color you can share on your wfmbs 06-ar10 4A1 from yest...maybe i can use that as leverage to go beat the guy up that owns the 06-ar12 1a1 bonds....as of late last nite it sounded like he was starting to warm up to the idea of coming off his level.....

40.     The Wellington representative asked Litvak, "what's the current size and offer" on the MBS, and Litvak responded, "its 3+mm current and he was offering them at 77...."  About twenty minutes later, Litvak reported that the seller was not in yet: "he … usually rolls in around now.....so should know soon brotha....."  Half an hour later, Litvak told the Wellington representative that he had bought the MBS at 75-28 and provided details of the supposed negotiation:

> winner winner chicken dinner...he is gonna sell em to me at 75-28 as I told him to not get cute and just sell the bonds so you can own them at 76....he said cool.....its 6.23mm orig....a'ight?

41.     Wellington agreed to purchase $6.23 million of the MBS at 76.

42.     In actuality, Jefferies had purchased the MBS on December 14, 2009 at 70 (not "75-28") and held it in its inventory at the time of the sale to Wellington.  On December 23, 2009, Litvak concocted the supposed seller and fabricated the details of a negotiation.  As he had done before, Litvak lied about the purchase price, Jefferies' compensation on the trade, and the fact that the MBS was being sold out of Jefferies' inventory.

43.     Through his misconduct, Litvak made over $150,000 in additional compensation

for Jefferies on this trade.

### January 7, 2010 Trade with York

44.     On January 7, 2010, Litvak communicated with a representative at York Capital

Management Global Advisors, LLC ("York") about selling $40 million of a MBS called DLSA

Mortgage Loan Trust 2006-AR1 2A1A (DLSA 2006-AR1 2A1A), held by York, to another

customer.  Litvak told the representative that the other customer had bid 60-24.  The York

representative asked Litvak how much he wanted to be compensated for the trade:

Litvak:                   i am happy when I get any trades…..lol…in all seriousness….i think 8/32s
                          is great….so maybe you sell em to me at 60-28 and i sell em to him at 61-
                          4….something like that..but im also happy to get you 61 and just tell him
                          to pay me 61-8…..wanna get you the highest i can…

York representative:   well i want best execution obv so try to get him to 61-8!

Litvak:                   we are doneski gorgeous! im selling him bonds at 61-8……will buy em
                          from you at 61 k?. . .

York representative:   great! . . . .

45.     As a result of this back-and-forth, York agreed to sell the MBS at 61.

46.     Litvak misrepresented the resale price and the compensation he would receive for

Jefferies.  He did not sell the MBS at "61-8," as stated, but at 62-12.  Thus, instead of the "8/32s"

he represented Jefferies would make, the firm actually was compensated 44 ticks for the trade.

47.     Through his misconduct, Litvak made over $220,000 more for Jefferies on this

trade.

### March 29, 2010 Trade with QVT

48.     On March 29, 2010, Litvak learned from a Jefferies colleague that Jefferies was

going to buy $3.1 million of a MBS called Countrywide Alternative Loan Trust 2006-OA3 1A1

(CWALT 2006-OA3 1A1) at 50-16.  Litvak then approached a representative at QVT Financial,

LP ("QVT") about purchasing the MBS.  Although Litvak knew Jefferies was buying the MBS at 50-16, he told the representative, "i have a small guy showing me 3.1mm orig of cwalt 06-oa3 1a1 at 51-16 . . . .  i can prob buy the bonds from him at 51-8 and sell em to you at 51-12 if you want . . . ."

49.     The QVT representative told Litvak he was interested in the MBS and that he trusted Litvak to get him the best price:

QVT representative:    I would take them from you – obviously cheaper the better, but if you
                       think 51-12 is the cheapest they come, I'll trust you on that

Litvak:                ok….let me just cal the guy and see if i can get em at 51 …brb [be right
                       back]

QVT representative:    thanks

Litvak:                winner winner!!! Bot em at 51-00 big man!! 3.1mm orig

QVT representative:    wanna say 51-06 (you just earned yourself 2 extra tics)?

50.     Litvak lied to QVT about the acquisition price.  Jefferies bought the MBS at 50-16, not "51-00" as represented.  Litvak thus also lied about Jefferies' compensation.  QVT purchased $3.1 million of the MBS at 51-6.  As a result, Jefferies earned 22 ticks on the trade and not the 4 ticks Litvak offered, nor the 6 ticks the grateful buyer eventually agreed upon.

51.     Through his misconduct, Litvak made more than $5,000 more for Jefferies on this trade.

### March 31, 2010 Trades with AllianceBernstein

52.     On March 31, 2010, Customer A, an investment adviser to a private fund, asked Jefferies to find buyers for several MBS, including Lehman XS Trust Series 2007-15N 2A1 (LXS 2007-15N 2A1) and Harborview Mortgage Loan Trust Mortgage Loan Pass-Through

Certificates, Series 2006-10 2A1A (HVMLT 2006-10 2A1A).  Litvak approached  a

representative at AllianceBernstein about buying the MBS.

      53.     Litvak told the AllianceBernstein representative that the seller had offered to sell

the HVMLT MBS at 58-00 and the LXS MBS at 58-8:

| | |
|---|---|
| Litvak: | he will sell to me 20mm orig of hvmlt 0610 @ 58-00 but he is being harder to knock back on the lxs bonds…said that he thinks that one is much cheaper yada yada yada…he told me he would sell them to me at 58-8 (30mm orig)…I would be fine working skinnier on [] these 2…but think you are getting good levels on these… |
| Representative: | is he paying u or am I? |
| Litvak: | all the levels I put in this room are levels he wants to sell me…I will work for whatever you want on these….<br><br>so to recap levels he is offering to me:<br><br>hvmlt 06-10 2a1a (20mm orig) @ 58-00<br>lxs 40mm orig at 58-8…<br>Bot em |
| Representative: | Can u wash the hvmlt and [add] 5 ticks to lxs?... |
| Litvak: | thats fine. |

      54.     Litvak misrepresented to AllianceBernstein the prices at which Jefferies had

acquired the MBS for re-sale.  Litvak bought the HVMLT MBS at 57-16 (not the "58-00" he told

Alliance Bernstein) and he acquired the LXS MBS at 56-16 (not "58-8" he represented).

      55.     Litvak also misrepresented the compensation that Jefferies would receive for

these trades.  AllianceBernstein purchased the $20 million HVMLT MBS at 58 and $40 million

of the LXS MBS at 58-13.  As a result, on the HVMLT trade, Litvak made 16 ticks for Jefferies;

he did not work for free (or "wash" the trade) as he had agreed.  And, on the LXS MBS, Litvak

made 61 ticks for Jefferies; he did not work for "5 ticks" as agreed.

56.     As a result of his misconduct, Litvak made over $600,000 more for Jefferies on the LXS trade and over $50,000 more on the HVMLT trade.

### *April 1, 2010 Trade with AllianceBernstein*

57.     Customer A also asked Jefferies to find buyers for a MBS called Residential Accredit Loans, Inc., Series 2007-QH1 A1 (RALI 2007-QH1 A1).  On April 1, 2010, in an effort to find a buyer, Litvak went back to the representative at AllianceBernstein, first offering the bond at 57 and claiming to have traded $25 million of the same MBS at 57 that morning.  The representative asked, "is 57 the best we can do?"  Litvak promised to go back to the seller to try to push down the price.  The representative urged, "bid 'em best u can."  Litvak then told the representative that the seller "will sell me bonds at 56-24" and that "i would work for 2-4/32s on these with you . . . ."  AllianceBernstein agreed to pay Jefferies 4 ticks and bought $25 million of the MBS at 56-28.

58.     Litvak lied about Jefferies' acquisition price.  Jefferies did not buy the MBS at "56-24," as he stated, but at 56.  He also lied about Jefferies' compensation.  Jefferies received 28 ticks for the trade, not the "2-4/32s" Litvak said he would work for, nor the 4 ticks AllianceBernstein agreed to pay Jefferies for the trade.

59.     As a result of his misconduct, Litvak made more than $140,000 more for Jefferies on this trade.

### *April 1, 2010 Trade with QVT*

60.     On April 1, 2010, Customer A sold Litvak another $45 million of the LXS 2007-15N 2A1 MBS at 56-16.  Later the same day, Litvak approached a representative at QVT about buying the bonds.

61.     The QVT representative told Litvak he was interested in the MBS and would "pay 56-8 to me."  Although Jefferies already owned the MBS, Litvak pretended that he was arranging the trade with an outside party.  Litvak agreed to "show" the seller QVT's bid, but cautioned, "gonna be hard to get em that low given where we just traded 25mm of em . . . but i will ask."  Litvak then reported back, "sorry bro . . . . he said he would sell at 58 (which means I can buy em 8/32s cheap to that)…he is letting me work for 8/32s on these trades….so 58 to you is gonna be best."

62.     When QVT agreed to raise its bid to 57-00, Litvak again pretended to negotiate with the "seller" and told the QVT representative that the seller "just told me he was firm at 57-16…..if i call him back and go lower he is gonna rip my head off….i just know it . . . he already is giving me sht that I sold the 1st piece at 59."

63.     Litvak then told QVT that he "would be willing to work super skinny just to try and get er done," and agreed to "work" for "2/32s."  With that representation, QVT Financial purchased $20.868 million of the MBS at 57-18.

64.     Litvak lied to QVT about Jefferies' acquisition price (which was 56-00, not "57-16"), the compensation (which was 34 ticks, not "2/32s"), and the source of the MBS (pretending to negotiate with an active seller when Jefferies already owned the bond).

65.     As a result of his misconduct, Litvak made over $170,000 more for Jefferies on this trade.

### *April 23, 2010 Trade with Blackrock*

66.     On April 23, 2010, Litvak learned from a Jefferies colleague that a customer wanted to sell $2 million of a MBS called GMACM Mortgage Loan Trust 2006-AR1 2A1

(GMACM 2006-AR1 2A1) at 80-00.  Litvak then approached a representative at Blackrock, Inc. ("Blackrock") about purchasing the MBS.

67.     Although Litvak knew the seller was willing to sell at 80-00, Litvak told Blackrock,"i have a guy that has 2mm orig and he wants to sell em at 81-16."  Two hours later, Litvak told Blackrock that he had bought the GMACM MBS at 81, and Blackrock agreed to buy the MBS from Jefferies at 81-4.

68.     Litvak misrepresented the acquisition price.  Jefferies acquired the MBS at 80-00, not 81, as represented.   Litvak thus also lied about Jefferies' compensation.  Jefferies was paid 36 ticks, not the 4 ticks Blackrock agreed to.

69.     Through his misconduct, Litvak made over $10,000 more for Jefferies on this trade.

### May 3, 2010 Trade with Angelo Gordon

70.     On May 3, 2010, Litvak approached a representative at Angelo Gordon about buying more of a MBS called BSARM 2007-4 22A1.  Jefferies had bought $755,000 of the MBS on April 29th at 74.  Although he knew the MBS was in Jefferies' inventory, Litvak pretended that he was arranging a trade with an active outside party.  Litvak told the Angelo Gordon representative that the phantom seller was "offering me bonds at 77.50" and that "i was gonna bid him 75 and see what he says." The representative agreed to "buy em, up 8 to me . . . . wherever u get em."  In other words, Angelo Gordon told Litvak that it would pay Jefferies 8 ticks over Jefferies' purchase price.

71.     Litvak then pretended to negotiate with the phantom seller, telling the Angelo Gordon representative, "he came back to my 75 bid with a 77 counter…i fok'd him at 76 and waiting to hear back…im not worried…..i will call him in a sec."  Minutes later, Litvak reported,

"we[']re good bro…76-8 ok?"  Angelo Gordon bought $755,000 of the MBS at 76-8, or 8 ticks over Litvak's represented purchase price of 76.

72.      Litvak lied about Jefferies' acquisition price (74, not "76"), Jefferies' compensation (72 ticks, not 8 ticks) and the source (pretending to be arranging a trade when Jefferies owned the MBS in its inventory).

73.      As a result of this misconduct, Litvak made over $10,000 more for Jefferies on this trade.

### *May 4, 2010 Trade with AllianceBernstein*

74.      On May 4, 2010, Litvak told a representative at AllianceBernstein that he may be able to buy $30 million of a MBS called Washington Mutual Mortgage Pass-Through Certificates, Series 2006-AR14 1A1 (WAMU 2006-AR14 1A1) at 89-16 and resell the MBS to AllianceBernstein.  The AllianceBernstein representative said he was interested, and soon after, Litvak reported, "winner winner chicken dinner….he will sell me 30mm orig at 89.5 bro….i will work for whatever you want on this one."  The AllianceBernstein representative agreed to buy the MBS and told Litvak to "tack on 4 ticks" as compensation.  Jefferies sold the MBS to AllianceBernstein at 89-20.

75.      Litvak misrepresented the acquisition price and the compensation he would receive for Jefferies.  Jefferies bought the MBS at 88-24, not at "89.5" as stated.  Jefferies was compensated 28 ticks, not "4 ticks" as agreed.

76.      As a result of his misconduct, Litvak made over $60,000 more for Jefferies on this trade.

### *May 13, 2010 Trade with Putnam*

77.     On May 13, 2010, Litvak approached a representative at Putnam Investment Management, LLC ("Putnam") about buying $20 million of a MBS called Morgan Stanley Mortgage Loan Trust 2007-11AR 2A5 (MSM 2007-11AR 2A5).  Litvak told the Putnam representative that he had bought the MBS for "m53s" or mid-53s: "I just bot the msm 07-11ar 2a5 bonds . . . . paid m53s on em…. would sell those to you guys if u cared."  Putnam purchased the MBS at 54.

78.     Litvak misrepresented the acquisition price and, thus, Jefferies' compensation on the trade.  He did not purchase the MSM MBS at "m53s" (or mid-53s), but at 53-00.  As a result, Jefferies earned 32 ticks on the trade, rather than approximately 16 ticks as agreed.

79.     As a result of his misconduct, Litvak made approximately $70,000 more for Jefferies on this trade.

### *June 17, 2010 Trade with Angelo Gordon*

80.     On June 17, 2010, Litvak purchased $4.7 million of a MBS called CHL Mortgage Pass-Through Trust 2005-HYB6 2A1 (CWHL 2005-HYB6 2A1) at 62-16.  Later that day, Litvak approached a representative at Angelo Gordon in an effort to resell the MBS.  Litvak told him that he had bought the MBS at 68-1 and asked, "want em at 68-16?"  The representative agreed and Angelo Gordon purchased the CWHL MBS at 68-16.

81.     Litvak lied about Jefferies' acquisition price and, thus, Jefferies' compensation.  Litvak told Angelo Gordon that he had bought the MBS at 68-1, when in fact he had purchased the MBS at 62-16.  As a result, he earned Jefferies 192 ticks on the trade, instead of the agreed-to 15 ticks.

82.     As a result of his misconduct, Litvak made over $120,000 more for Jefferies on this trade.

### July 1, 2010 Trade with Invesco

83.     On July 1, 2010, Litvak sent out a bid list that included a MBS called Structured Adjustable Rate Mortgage Loan Trust, Series 2005-21 7A1 (SARM 2005-21 7A1).  (Customers typically send "bid lists" to their brokers to solicit offers on a list of bonds.)  A representative from Invesco responded to the list.  The representative said that Invesco would bid 79-24 on the MBS.  Litvak responded that he would "brb" ("be right back"), to which the representative replied, "thx, got some room too."

84.     Litvak then informed Invesco about the results from his bid:

| | |
|---|---|
| Litvak: | winner bro…he had 2 other guys that were at 79 and trying to improve…but he just sold em to us…I bid your level….so will work for whatever you want big man…. |
| Representative: | wow…that was fast.  nice work.  6 ticks cool?  79-30 to me? |
| Litvak: | ure timing was perfect…3pm bwic and he is good about trading things fast…so we got in there right at the right time…good teamwork…6/32s is great…thanks BN. |

85.     Litvak lied to the representative that he had "bid" his "level."  Jefferies had acquired the security at 79-16, not at Invesco's requested bid of 79-24.  Litvak also misled Invesco about the compensation that Jefferies would receive.  Invesco purchased $59 million of the MBS at 79-30, and therefore, Litvak received 14 ticks for the trade and not the agreed to "6 ticks."

86.     As a result of his misconduct, Litvak made over $70,000 more for Jefferies on this trade.

### *September 29, 2010 Trade with AllianceBernstein*

87.     On September 29, 2010, a Jefferies colleague told Litvak that Jefferies had purchased $3.27 million of a MBS called HarborView Mortgage Loan Trust, Series 2007-7 2A1A (HVMLT 2007-7 2A1A) at 65.   An hour later, Litvak approached a representative at AllianceBernstein in an effort to sell the MBS.   Although he knew that Jefferies had already bought the MBS at 65, Litvak pretended to be arranging a trade for an active outside seller who was offering the MBS at 67:

> small guy just gave me an order on the hvmlt 07-7 2a1a gem… he offered bonds at 67 …. let me know if you guys want to show a level….i havent really got a read on how married to 67 he is . . . .

88.     When the representative responded that he would bid 66 for the HVMLT MBS, Litvak pretended to negotiate with the phantom seller and reported back that "he would sell bonds to me 66-16 best…."   The representative indicated that he was interested in buying the MBS at 66-16, and ten minutes later, Litvak responded "i bot a lil cheap to 66-16 so we can be done . . . . 66-16 to u."   AllianceBernstein purchased the MBS at 66-16.

89.     Litvak lied to AllianceBernstein about the acquisition price (which was 65, not "lil cheap to 66-16"), the compensation (which was 48 ticks, not "lil cheap," or a small number of ticks), and the source of the MBS (pretending he was arranging a trade, when he knew Jefferies already owned the bond).

90.     Through his misconduct, Litvak made more than $30,000 more for Jefferies on this trade.

### *November 22, 2010 Trade with Magnetar*

91.     On November 18, 2010, Jefferies bought $14.262 million of a MBS called First Horizon Alternative Mortgage Securities Trust 2005-AA10 2A1 (FHAMS 2005-AA10 2A1) at 51-8.   Four days later, Litvak approached a representative at Magnetar Capital LLC

("Magnetar") about buying the MBS.  Although he knew that Jefferies held the MBS in its inventory, Litvak pretended he was arranging a trade with an active seller and told Magnetar that the seller was "offering me bonds at 55."

92.     The Magnetar representative said he was interested in the MBS and instructed Litvak to bid 50-16.  He asked Litvak what kind of seller was involved, and Litvak replied, "money mngr."  Litvak then pretended to negotiate with the phantom seller, reporting back to Magnetar that "he came off 1pt to 54 …..i am getting the sense that he really doesnt want to sell bonds that much lower than that…..based on my last conversation."  The Magnetar representative responded, "you tell me – isn't it a low 50s bond?"

93.     After some further consideration, the Magnetar representative raised his bid to 52-16, but emphasized to Litvak that "definitely do not want to pay more than what I have to. . . ."  Litvak continued his fabricated negotiation, reporting back after 30 minutes, "he is at 53-16 bro….i beat him up pretty good to get that….and think we are getting to the end of the rope with him . . . ."

94.     Magnetar then raised its bid to 53.  Litvak reported back twenty minutes later that he had bought the MBS at 53, emphasizing how hard he had negotiated with the seller:

> alright dude…he sold me bonds at 53….but it was painful getting him to do it! he literally was talking about bwic'ing them….and i was like dude…u cant…..so whatever the case …..i bot bonds at 53 . . . .

95.     After this communication, Magnetar agreed to buy the MBS at 53-8.

96.     Litvak lied about the acquisition price (51-8, not "53") and, thus, Jefferies' compensation (64 ticks, not 8 ticks).  He also lied about the source of the MBS (pretending he was arranging the trade when Jefferies owned the MBS in its inventory).

97.     As a result of this misconduct, Litvak made more than $90,000 more for Jefferies on this trade.

### *January 7, 2011 Trade with DW Investment and Columbia*

98.      On January 7, 2011, Litvak lied to both the seller and buyer while arranging the

trade of $20 million of a MBS called Bear Stearns Mortgage Funding Trust 2007-AR1 2A4

(BSMF 2007-AR1 2A4) .  Columbia Management Investment Advisors, LLC ("Columbia") was

seeking to sell the MBS and DW Investment Management, LP ("DW Investment") was seeking

to buy the MBS.

99.      Litvak lied to Columbia about the price at which he would resell the MBS.  After

learning that a representative of DW Investment had bid 19 for the MBS, Litvak told a

representative at Columbia that the prospective buyer "will pay me 18-26.  if u want I will work

for 2/32s on this one."  Following this exchange, Columbia agreed to pay 2 ticks for the trade

and sold the MBS to Jefferies for 18-24.

100.      Litvak then used a Jefferies colleague to mislead the DW Investment

representative about the acquisition price.  After agreeing to buy the MBS from Columbia at 18-

24, Litvak told the Jefferies salesperson who was negotiating with DW Investment, "Done.  I bot

@ 18-24. Just tell [DW Investment] We bot em @ 19-4."  The Jefferies salesperson then told the

DW Investment representative, "jesse bot em 19-04… pay me what u like on top."  DW

Investment agreed to purchase the MBS at 19-16.

101.      Through his misconduct, Litvak made more than $40,000 more for Jefferies on

this trade.

### *January 11, 2011 Trade with Magnetar*

102.      On January 11, 2011, Litvak communicated with a representative at Magnetar

regarding a MBS called HarborView Mortgage Loan Trust Series 2004-9 4A3 (HVMLT 2004-9

4A3).  After learning from a Jefferies colleague that Magnetar could buy the MBS for 60-16,

Litvak told the Magnetar representative, "they are offering me bonds at 61." When Magnetar expressed interest in the MBS, Litvak told the representative, "he is gonna sell me bonds 4/32s cheap to 61….so you can have em at 61 and if your feeling the love anything above that would be great….but like I said….im totally cool at 61 too…." Magnetar agreed to buy $49.3 million of the MBS at 61-4.

103.   Litvak lied about the acquisition price and, thus, Jefferies' compensation on the trade. Jefferies bought the MBS for 60-16, not 60-28 (or "4/32s cheap to 61"), as represented. Jefferies earned 20 ticks on the trade, not the 8 ticks agreed to.

104.   As a result of this misconduct, Litvak made more than $30,000 more for Jefferies on this trade.

### January 26, 2011 and March 28, 2011 Trades with Monarch

105.   On January 25, 2011, Jefferies bought $16.05 million of a MBS called Washington Mutual Mortgage Pass-Through Certificates, Series 2005-AR19 A1B3 (WAMU 2005-AR19 A1B3) at a price of 72-4. The next day, January 26th, Litvak approached a representative at Monarch Alternative Capital LP ("Monarch") about the MBS, saying, "im seeing 15mm orig of wamu 05-ar13 a1b3 bro." Litvak pretended to be working with an active seller of the MBS and told the representative that the purported seller had told Litvak "to work em at 76…..i think i can buy these at 75 though…..but below that he might check away." The representative expressed interest in buying the MBS, and Litvak told him that he would "bid him at 74 and try to get em as cheap as i can." Seven minutes later, Litvak told the Monarch representative, "i bot bonds at 74-24." Monarch agreed to buy $15 million of the MBS for 75-8.

106.   Litvak misrepresented the acquisition price (which was 72-4, not "74-24") and, thus, Jefferies' compensation (100 ticks, not 16 ticks).

107.    On January 26, 2011, Jefferies bought $7.95 million more of WAMU 2005-AR19 A1B3 at 74.

108.    On March 28, 2011, Litvak approached a representative at Monarch about purchasing the MBS.  Although Jefferies had owned the MBS for over sixty days, Litvak again pretended to be arranging a trade and fabricated a negotiation with a phantom active seller.

109.    Litvak told the Monarch representative, "ny guy that owns that ar19 a1b3 is a seller at 77 to me fwiw."  The Monarch representative told Litvak he was a "76 bid."  Litvak pretended to negotiate with the "ny guy" and told the Monarch representative that he had "bid him 75 and he said nothing to do….but said he would come back with a level off 77."  Ten minutes later Litvak reported that "he came back at 76-16 brah."  In response, the Monarch representative offered to increase his bid to 75-24, with a total payment of 76-08.

110.    The Monarch representative then told Litvak that he could not "pay more than 76-08."  Litvak told him that he "understood" and, fifteen minutes later, reported back, "we are good dude…im buying em at 76."  Monarch bought $8.91 million of the MBS at 76-8.

111.    Litvak misrepresented the acquisition price (74, not "76") and, thus, Jefferies' compensation (74 ticks, not 8 ticks).

112.    As a result of his misconduct, Litvak made more than $100,000 more for Jefferies on these two trades.

### *April 12, 2011 Trades with Soros*

113.    On April 12, 2011, Litvak communicated with a representative at Soros Fund Management LLC ("Soros") about a MBS called GreenPoint Mortgage Funding Trust 2006-AR3 4A1 (GPMF 2006-AR3 4A1).  Soros was interested in buying the MBS, and Litvak told the representative that the seller "wont say where in the 57s…but i don't think we have to be north

of 57-16 as i read the tea leaves."  The Soros representative asked Litvak to bid 57-8 for the

bonds, and seven minutes later, Litvak reported, "i showed 57-5 and we bot em w/a 57-1 cover!

good teamwork."  Soros agreed to buy $10.2 million of the MBS at 57-9.

114.    Litvak lied about the acquisition price.  He had purchased the MBS at 56-10, not

the "57-5" he represented.  He also lied about Jefferies' compensation.  Jefferies earned 31 ticks

on the trade, not the 4 ticks agreed upon. Litvak also lied about the second-highest price for the

MBS, or "cover."

115.    Through his misconduct, Litvak made more than $40,000 more for Jefferies on

this trade.

116.    Later the same day, Litvak approached the Soros representative about buying

more GPMF 2006-AR3 4A1.  He first instructed Litvak to bid 56-16.  Litvak reported that they

were "cover" – that is, the second-highest bid.  In response, Soros offered to "go to 56-24."

About fifteen minutes later, Litvak told the Soros representative, "bot em there . . . 56-22 cover"

and Soros agreed to buy $9.75 million of the MBS at 57.

117.    Litvak had lied again about the acquisition price.  He bought the MBS at 56-17,

not at 56-24, as represented.  He also lied about Jefferies' compensation.  Jefferies earned 15

ticks on the trade, not the 8 ticks agreed upon.  He lied about the cover again, as well.

118.    As a result of his misconduct, Litvak made more than $10,000 more for Jefferies

on this trade.

### June 3, 2011 Trade with Monarch

119.    On June 3, 2011, Litvak approached a representative at Monarch about buying a

MBS called Bear Stearns Mortgage Funding Trust 2007-AR4 2A1 (BSMF 2007-AR4 2A1).

Litvak told the Monarch representative, "I just bot these h61s."  Monarch agreed to purchase $13.25 million of the MBS at 62.

120.    Litvak lied to Monarch about the acquisition price and, thus, Jefferies' compensation on the trade.  He had actually bought the MBS at 61 and not "h61s" (meaning high 61s).

121.    Through his misconduct, Litvak made more than $60,000 more for Jefferies on this trade.

### June 22, 2011 Trade with AllianceBernstein

122.    On June 22, 2011, Litvak communicated with a representative at AllianceBernstein about a MBS called HVMLT 2007-7 2A1A.  Litvak told the representative that he "bot em at 67-21," and that "if you guys want em you can have em….if not….thats ok too. . . ."  The AllianceBernstein representative asked if AllianceBernstein could "buy them +4?" (i.e., at purchase price plus four ticks).  Litvak responded, "sure…67-25 works for me."

123.    AllianceBernstein bought $13.570 million of the MBS at 67-25.

124.    The same day, Litvak communicated with a colleague at another firm about the possible trade with AllianceBernstein.  Litvak told the person that if he received a bid from AllianceBernstein, "im def gonna be working for something. . . . f this 4-8/32s sht."

125.    Litvak misrepresented the acquisition price.  Jefferies had bought the MBS at 67-15, not "67-21" as represented.  He also lied about Jefferies' compensation.  Jefferies earned 10 ticks on the trade, not the "+4" (or 4 ticks) agreed upon.

126.    Through his misconduct, Litvak made more than  $10,000 more for Jefferies on this trade.

### August 11, 2011 and August 15, 2011 Trades with AllianceBernstein

127.     On August 11, 2011, Litvak communicated again with a representative at AllianceBernstein concerning a MBS called HarborView Mortgage Loan Trust, Series 2007-4 2A1 (HVMLT 2007-4 2A1).  Litvak showed the MBS to the representative, who bid 64 for the MBS.

128.     Litvak then suggested to the representative that he should raise his bid because Litvak did not think that the seller would go below 65.

| Litvak: | so super full disclosure.…other bidder is not going to get higher (he is 64-20) and the cheapest counter i have seen is 65-16.…i don't think he sells bonds with a 64h……but i think he sells bond in that 65-8 range |
|---|---|
| Representative: | If you can get him to 65flat and he pays you…we will buy. |
| Litvak: | ok |
| Litvak: | let me go work my magic |
| Litvak: | bot em at 64-30 …7.7 mm orig |
| Representative: | Cool.  Thx for the trade. |

129.     AllianceBernstein purchased $7.7 million of the MBS at 65.

130.     Litvak lied to AllianceBernstein about the acquisition price.  Litvak had purchased the MBS at 64-18, not "64-30" as he told the representative.  Litvak also misled AllianceBernstein about the amount of Jefferies' compensation for the trade.  AllianceBernstein purchased the MBS for 65, and therefore Jefferies' profit was 14 ticks rather than the 2 ticks AllianceBernstein agreed to.

131.     Through his misconduct, Litvak made more than $10,000 more for Jefferies on this trade.

132.     Four days later, on August 15, the representative told Jefferies that he was interested in looking at a MBS called IndyMac INDX Mortgage Loan Trust 2006-FLX1 A1

(INDX 2006-FLX1 A1) and suggested bidding at 63-20.  After Litvak told the representative that his bid was too low, and something over 65 was required, another AllianceBernstein representative told Litvak the best bid was 65-05.

133.    Litvak then purchased the MBS for Jefferies at 65-1.

134.    Although he knew Jefferies already bought the MBS at 65-01, Litvak pretended to continue to negotiate with the seller, telling AllianceBernstein,  the "account coming back to us asking us if we can pay them 65-16…sounds like the other guy was right in that context…."  The representative responded, "we will look at it there," and, sixteen minutes later, Litvak reported, "he sold em to me at 65-14."

135.    AllianceBernstein purchased $12.036 million at 65-16.

136.    Litvak misrepresented the acquisition price (65-1, not "65-14") and, thus, Jefferies' compensation (15 ticks, not 2 ticks).

137.    As a result of his misconduct, Litvak made more than $20,000 more for Jefferies on this trade.

### *Other Trades*

138.    In addition to the transactions described above, Litvak engaged in similar misrepresentations of the purchase and sale price of MBS on other occasions, including (but not limited to) on March 22, 2010 with Angelo Gordon; on October 27, 2010 with Angelo Gordon; on June 25, 2010 with Western Asset Management Company; and on January 11, 2011 with DE Shaw & Co, L.P.

139.    In total, Litvak's misrepresentations generated over $2.7 million in additional revenue for Jefferies.

140.    Jefferies determined Litvak's bonus based on market conditions, firm-wide results, and personal performance.  The factors considered when evaluating a trader's personal performance included revenue generation, client impact, and overall contribution to the firm. During the years at issue, Litvak received total discretionary bonuses of $11,783,296.

**First Claim for Relief**
**(Violation of Section 17(a) of Securities Act)**

141.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 140 above as if set forth fully herein.

142.    By reason of the foregoing, Litvak, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instruments of transportation or communication in interstate commerce or by the use of the mails, in the offer or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state a material fact necessary to make the statements not misleading; or (c) engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon the purchasers of such securities.

143.    By engaging in the conduct described above, Litvak has violated, and unless enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. §77q(a)].

**Second Claim for Relief**
**(Violation of Section 10(b) of Exchange Act and Rule 10b-5)**

144.    The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 140 above as if set forth fully herein.

145.    By reason of the foregoing, Litvak, directly or indirectly, acting intentionally, knowingly or recklessly, in connection with the purchase or sale of securities, by use of the

means or instrumentalities of interstate commerce or the facilities of a national securities

exchange or the mail:  (a) employed devices, schemes, or artifices to defraud; (b) made untrue

statements of material fact or omitted to state material fact(s) necessary to make the statements

made not misleading; or (c) engaged in acts, practices, or courses of business which operated as a

fraud or deceit upon certain persons.

146.    By engaging in the conduct described above, Litvak has violated, and unless

enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and

Rule 10b-5 thereunder [17 C.F.R. §240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.      Enter a permanent injunction restraining Litvak and each of his agents, servants,

employees and attorneys and those persons in active concert or participation with him who

receive actual notice of the injunction by personal service or otherwise, including facsimile

transmission or overnight delivery service, from directly or indirectly engaging in the conduct

described above, or in conduct of similar purport and effect, in violation of Section 17(a) of the

Securities Act [15 U.S.C. § 77q(a)]; and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)]

and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

B.      Require Litvak to disgorge his ill-gotten gains, plus pre-judgment interest;

C.      Require Litvak to pay appropriate civil monetary penalties pursuant to Section

20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Securities Exchange

Act [15 U.S.C. § 78u(d)(3)];

D.      Retain jurisdiction over this action to implement and carry out the terms of all

orders and decrees that may be entered; and

E.      Grant such other and further relief as the Court deems just and proper.

## JURY DEMAND

The Commission hereby demands a trial by jury on all claims so triable.


                                Respectfully submitted,
                                /s/ John B. Hughes
                                John B. Hughes (CT05289)
                                Connecticut Federal Bar No. ct05289
                                Assistant United States Attorney
                                Chief, Civil Division
                                United States Attorney's Office
                                Connecticut Financial Center
                                157 Church St., 25th Floor
                                New Haven, CT   06510
                                (203) 821-3700
                                (203) 773-5373 (Facsimile)
                                E-mail:  John.Hughes@usdoj.gov

                                /s/ Rachel E. Hershfang
                                Rachel E. Hershfang (Mass. Bar No. 631898,
                                  CT phv05878)
                                Kerry Dakin (Mass. Bar No. 640826)
                                James Goldman (Mass. Bar No. 648488)
                                33 Arch Street, 23rd Floor
                                Boston, Massachusetts  02110
                                Telephone:  (617) 573-8987 (Hershfang direct)
                                Facsimile:  (617) 573-4590
                                E-mail:  HershfangR@sec.gov

                                Attorneys for Plaintiff
                                U.S. SECURITIES AND EXCHANGE
                                COMMISSION

Dated:  January 28 , 2013